UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

W. JEFFREY BOSTIC,

       Plaintiff,

v.                                            Civil Action No. 15-12723

DRUMMOND LTD.,

       Defendant.

## MEMORANDUM OPINION AND ORDER

Pending is the motion for summary judgment filed on March 14, 2017, by defendant Drummond Ltd. ("Drummond"). This case presents a wrongful discharge claim based on age brought by a former employee under the West Virginia Human Rights Act.

## I.  Background

Drummond is a limited partnership organized under the laws of Alabama with its principal place of business in Birmingham, Alabama, that conducts mining operations in Colombia.  See Jones Affidavit (ECF Doc. No. 3-1) at ¶ 2. Plaintiff W. Jeffrey Bostic ("Bostic") is a resident of West Virginia and was formerly employed by Drummond as the superintendent of its Colombian highwall mining operations.

Bostic was hired by Drummond's President and CEO, Mike Tracy, around March 11, 2013, to be the superintendent of those

1

operations.  <u>See</u> Bostic Dep. (Exhibit A to Def.'s Mot. for Summary Judgment; Exhibit 1 to Plaintiff's Resp.) at 75.  After working for several months at Drummond's headquarters in Alabama developing plans for the mining operations, Bostic was sent to the mine site in Colombia.  <u>Id.</u> at 67-71.

Bostic's only supervisor in Colombia was Ron Damron, whom Bostic did not know prior to being hired by Drummond.  <u>Id.</u> at 65, 94; Damron Dep. (Exhibit B to Def.'s Mot. for Summary Judgment; Exhibit 3 to Pl.'s Resp.) at 20.  In Colombia, Bostic worked 13-16 hour days for 14 days in a row, after which time he would return to his home in Alum Creek, West Virginia for a 7-day break.  Bostic Dep. at 5, 88.  While Bostic was off duty or home for his 7-day break, Sherman Mullins, who still works for Drummond in the same position, was in charge of the highwall mining crew.  Bostic Dep. at 114-15; Mullins Dep. (Exhibit D to Def.'s Mot. for Summary Judgment; Exhibit 2 to Pl.'s Resp.) at 13-14.

According to Mullins, Bostic never did anything that was unsafe or that would put anyone's safety in jeopardy and he did not know of any performance issues relating to Bostic.  Mullins Dep. at 17, 29-30.

In 2014, Damron wanted to hire an assistant superintendent who would be in charge when Bostic was home on

his 7-day break.  See Bostic Dep. at 94-95.  Bostic interviewed 44-year-old Joe Scott of Boone County, West Virginia for this position.  After telling Damron that Scott would be a good fit, he was hired.  Id. at 95-96.

After Bostic spent 3 to 6 months training Scott in Colombia, Damron called then 59 year-old Bostic on October 21, 2014, while on break in West Virginia and fired him.  See Damron Dep. at 44-45; Mullins Dep. at 18-19.  Damron made the decision to terminate Bostic on his own.  Damron Dep. at 34.  According to Mullins, after Bostic was fired, Scott immediately assumed Bostic's responsibilities at Damron's direction.  Mullins Dep. at 18-19.  Mullins, who like Scott was 44 years of age, and the other Americans working at Drummond's Colombia site found the firing to be unusual.  Mullins Dep. at 45.

Although Bostic states that he asked Damron multiple times why he was fired, Damron failed to give him a reason. Bostic Dep. at 37.  Drummond's internal termination form additionally does not state the reason for his termination.  See Exhibit 5 to Pl.'s Resp.

Bostic contends that he performed his duties admirably with Drummond and was never disciplined or criticized in any way.  Bostic Dep. at 106, 158-59.  Despite this, Bostic alleges that he was fired at age 59 due to his age, and replaced with

3

Scott, a much younger worker, in violation of the West Virginia Human Rights Act, W. Va. Code § 5-11-1, et seq.

In its motion for summary judgment, Drummond asserts that the "last straw" that led to Bostic's termination occurred on the night of October 14, 2014. That night, Bostic was off duty so that Mullins was in charge of the mining operations. Pl.'s Resp. at 7; Bostic Dep. at 123-24. Bostic received a call that the operator failed to put the pins into the beams, and the beams were pushed 20 feet under the mountain before the mistake was realized. Pl.'s Resp. at 7; Bostic Dep. at 123-24. Without the pins in place, the system could not properly retract, meaning the miner head, which cuts the coal, would be stuck in the mountain. Pl.'s Resp. at 7; Bostic Dep. at 123-24; Def.'s Mem. at 8. Thus, it was imperative to formulate a plan to place the pins in the beams.

Bostic came to the site to help Mullins brainstorm ideas to solve the problem. Pl.'s Resp. at 7; Bostic Dep. at 123-24; Mullins Dep. at 37. Bostic and Mullins came up with several options, and called Damron to discuss them. Pl.'s Resp. at 7-8; Bostic Dep. at 124-26; Mullins Dep. at 37; Damron Dep. at 39. One of the options involved taking the augers out of one of the beams so that Mullins could crawl through the beam and manually put the pins in place. Pl.'s Resp. at 7-8; Bostic Dep.

at 124-26; Mullins Dep. at 36-37. Because this plan would require putting Mullins inside the mountain under the unsupported roof, Damron rejected it. Pl.'s Resp. at 8; Bostic Depo at 125; Mullins Dep. at 38. Damron regarded the rejected plan as the "last straw" as to Bostic. Def.'s Mem. at 9, Damron Dep. at 36-37. Mullins, Bostic and Damron came up with an alternative plan and after a few hours, successfully put a single pin in place, which was sufficient to fix the problem. Pl.'s Resp. at 8; Bostic Depo at 125-27.

## II.  Governing Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010) (same). A "genuine" dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

The moving party has the initial burden of showing --
"that is, pointing out to the district court -- that there is an
absence of evidence to support the non-moving party's case."
Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the
moving party satisfies this burden, then the non-moving party
must set forth specific facts, admissible in evidence, that
demonstrate the existence of a genuine issue of material fact
for trial.  See id. at 322-23; Fed. R. Civ. P. 56(c), (e).

Inferences that are "drawn from the underlying
facts  . . . must be viewed in the light most favorable to the
party opposing the motion." United States v. Diebold, Inc., 369
U.S. 654, 655 (1962).  A party is entitled to summary judgment
if the record as a whole could not lead a rational trier of fact
to find for the non-moving party. Williams v. Griffin, 952 F.2d
820, 823 (4th Cir. 1991).  Conversely, summary judgment is
inappropriate if the evidence is sufficient for a reasonable
fact-finder to return a verdict in favor of the non-moving
party. Anderson, 477 U.S. at 248.

### III. Discussion

#### 1.   WVHRA Requirements

In order to establish a prima facie case of age
discrimination, Bostic must prove that (1) he is a member of a

protected classification; (2) Drummond made an adverse decision concerning his employment; and (3) but for his protected status, the adverse decision would not have been made. Syl. Pt. 5, Waddell v. John Q. Sammons Hotel, Inc., 212 W. Va. 402, 404, 572 S.E.2d 925, 927 (2002).

"After the complainant makes a prima facie case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the negative action taken against the complainant." Kanawha Valley Regional Transp. Auth. v. W. Va. Human Rights Comm'n, 181 W. Va. 675, 677, 383 S.E.2d 857, 859 (1989). "The complainant then must prove that the employer's reason was pretextual." Id. "[O]nce the employer meets [its] burden of production, the presumption raised by the prima facie case is rebutted, and the inquiry proceeds to a new level of specificity. . . . [T]he onus is once again on the employee to prove that the proffered legitimate reason is a mere pretext rather than the true reason for the challenged employment action." Scaggs v. Elk Run Coal Co., 198 W. Va. 51, 72, 479 S.E.2d 561, 582 (1996) (internal citations and quotations omitted).

B. Application of the Burden Shifting Test

1. <u>Prima Facie Test</u>

The first two elements of Bostic's prima facie case are easily satisfied.  The protected classification includes individuals over 40 years of age, W. Va. Code § 5-11-3(k), and at the time of his termination, Bostic was 59.  With respect to the second element, there is no dispute that Bostic's termination constituted an adverse employment decision.

Only the third element is at issue.  As Bostic notes, in order to meet this element, a plaintiff need only show "some evidence which would sufficiently link the employer's decision and the plaintiff's status as a member of a protected class so as to give rise to an inference that the employment decision was based on an illegal discriminatory criterion."  <u>Barefoot v. Sundale Nursing Home</u>, 193 W. Va. 475, 484, 457 S.E.2d 152, 161 (1995).

In moving for summary judgment, Drummond contends that "there is simply no basis to support an inference that [Bostic] was terminated as a result of his age."  Def.'s Mem. at 16.  The court now assesses that contention.

In a recent decision, the West Virginia Supreme Court of Appeals held that,

>Pursuant to the "substantially younger" rule contained in O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, (1996), a plaintiff who is age forty or older, pursuing an age discrimination claim under the West Virginia Human Rights Act, W. Va. Code § 5-11-1 et seq., may satisfy the third prong of the prima facie age discrimination test contained in Syllabus Point 3 of Conaway v. Eastern Associated Coal Corp., 178 W. Va. 164, 358 S.E.2d 423 (1986) by presenting evidence that he/she was replaced by a "substantially younger employee."

Syl. Pt. 4, Knotts v. Grafton City Hosp., 237 W. Va. 169, 786 S.E.2d 188 (2016).

The West Virginia Supreme Court of Appeals additionally held that a plaintiff may also satisfy the third prong of the prima facie age discrimination test by presenting evidence that "'a substantially younger' employee" – such as Sherman Mullins – "who engaged in the same or similar conduct for which the plaintiff faced an adverse employment decision, received more favorable treatment." Syl. Pt. 5, Knotts, 237 W. Va. 169, 786 S.E.2d 188.

The Court in Knotts further elaborated that "age differences of ten or more years have generally been held to be sufficiently substantial to satisfy the 'substantially younger' rule." Knotts, 237 W. Va. at 179-180, 786 S.E.2d at 198-99 (internal citations and quotations omitted).

Bostic contends that he has put forth evidence that he meets the tests contained in syllabus points four and five of

Knotts.  Pl.'s Resp. at 13-14.  First, he contends that because he was 59 when he was terminated and was immediately replaced by Scott, who was 44 at the time, he meets the first of the tests, as indeed he does.  Id. at 14.  Second, he contends that although there were younger crew members who were more at fault on duty during the events of October 14, 2014, Bostic was the only one who was disciplined, which further evidences that he was fired due to his age.  Id. at 14-15.  Because Bostic was off duty the night of October 14, 2014, Mullins was in charge of the highwall mining crew when the pins were not put in the beams. Id.  In addition, it was Mullins' idea to crawl and drop the pins in.  However, the 44-year-old Mullins was not disciplined, interviewed, or questioned about the events by Damron, while the 59-year-old Bostic was fired.  Id.  Bostic thus meets the second test as well.

Bostic further argues, citing the testimony of Mullins, that Scott immediately replaced Bostic after Damron fired him.  Pl.'s Resp. at 14, n. 7.  Mullins Dep. at 18-19. Drummond alternatively asserts that Scott did not immediately replace Bostic after his discharge.  Def.'s Mem. at 11; Damron Dep. at 45, 66.  It is undisputed that Scott, who was 15 years younger than Bostic, was immediately promoted in terms of his responsibilities, to take over those Bostic previously held, and

a few months later, gained the title of superintendent of highwall mining operations.  <u>See</u> Damron Dep. at 45, 66 ("I put [Scott] in charge of the operation and maintenance of the highwall miner" after Bostic was fired; "I watched for maybe a couple of months towards the end of the year probably."); <u>see also</u> Mullins Dep. at 18 (stating that days after Bostic was let go Damron came to the pit with Scott and "informed us that they had to let [Bostic] go and that Scott would be assuming . . . his responsibilities").

Moreover, that Bostic was the only one punished for the events on October 14th further supports an inference of discrimination.  Although Bostic was in charge of the mining operations, Mullins, who clearly held somewhat of a supervisory role in that he was in charge while Bostic was off duty or at home in West Virginia, was not disciplined or even interviewed about the events that took place that night.

In contending that Bostic cannot establish the third element of his prima facie case, Drummond makes the following arguments: (1) because Drummond hired Bostic when he was 58 years old and terminated him when he was 59, his termination could not be motivated by his age; (2) Bostic's case "consists chiefly of 'conclusory allegations, improbable inferences, and unsupported speculation[;]'" and (3) because Bostic recruited

Scott and recommended that Drummond hire him to be his assistant superintendent, Bostic cannot offer evidence to show that "Drummond's hiring of Joe Scott to replace him was anything other than 'mere chance[;]'". Def.'s Mem. at 16-18.

Drummond's arguments are lacking in merit. Bostic alleges that while Mike Tracy hired him in 2013 knowing he was in his late 50s, it was Damron, who had no involvement in his hiring, who made the unilateral decision to terminate him in Colombia one and a half years later. <u>See</u> Damron Dep. at 34. Further, as noted above, Bostic has established that he was terminated and replaced with Scott, who is 15 years younger. Although the timing of Scott's official promotion to Bostic's position is disputed, it is undisputed that Scott, soon after Bostic was fired, took over Bostic's responsibilities and was thereafter promoted to his former position. As discussed, there is additionally evidence from which it can be inferred that Bostic was treated differently than 44-year-old Mullins for the incident on October 14, 2014. Finally, Drummond argues that because Scott was recruited by Bostic for the position of assistant highwall miner, Scott's replacing him was "mere chance." While the fact that Bostic recruited Scott may make it less likely that Bostic was fired due to his age, from this evidence a jury could also infer that the motive to fire Bostic

due to his age arose after Bostic recruited Scott and Damron met him.

Bostic has put forward evidence that after his termination he was replaced by someone who is 15 years younger than him and while he was allegedly terminated for the events of the night of October 14th, Mullins, who was 44 years old and held some sort of supervisory role at the mining site, was not disciplined or even questioned about the events of the night. The court finds on these facts that Bostic has established the inference of discrimination required to meet the third element of the prima facie discrimination test.  Accordingly, because Bostic has met his burden with respect to these elements, Bostic has established a prima facie case of discrimination.

## 2. Drummond's Nondiscriminatory Reasons for Firing Bostic

Because Bostic has established a prima facie case of discrimination, the burden of production shifts to Drummond "to come forward with a legitimate, nondiscriminatory reason for its action."  Barefoot, 193 W. Va. at 485, 457 S.E.2d at 162.

Drummond has come forward with three reasons for firing Bostic.  First, Drummond says that Damron determined that Bostic "never fully embraced Drummond's commitment to mine safety."  Def. Mem. at 2 (citing Damron Dep. at 31).  According

13

to Drummond, Bostic had performance issues relating to the company-wide effort to achieve Occupational Health and Safety Series ("OHSAS") 18001 certification, which "helps organizations put in place demonstrably sound occupational health and safety performance." Def. Mem. at 2, n. 1. To aid in obtaining the certification, the head of each division in Colombia was tasked with preparing and submitting a set of safety procedures that were followed in his operations. Id. at 2-3; Damron Dep. at 70-72. Damron testified that "[W]e were not getting the safety procedures and documentation for OHSAS that we needed. And in the review of all the other departments, everybody else was getting them in; however, highwall mining was lagging, and so I had to intervene." Damron Dep. at 71. Damron then brought in someone else to complete the safety requirements, and asked Bostic to give him support, and even then, [i]t was still a struggle." Id.

Drummond also states that on multiple occasions, Damron "personally observed incidents of blatant disregard for important safety protocols occurring under Bostic's watch." Def.'s Mem. at 3; Damron Dep. at 29-30. Damron witnessed "virtually no lock out tag procedures being utilized," and a "lack of use of personal protective equipment." Def.'s Mem. at 3; Damron Dep. at 29-30. Damron testified that it was the

responsibility of each individual that works "on the system to make sure the system is locked out before entering a place of an energized or possible moving parts area" and that it is the responsibility of the employees and "management all the way up through me to ensure that they utilize" the personal protective equipment.  Damron Dep. at 29-30.

Second, Drummond asserts that Bostic was fired due to engagement and communication issues.  According to Drummond, Bostic failed to make use of the planning system in place at Drummond for ordering parts.  Def.'s Mem. at 3.  Because Bostic did not properly implement the planning system, he was spending too much time ordering parts instead of managing the mining operations.  Id.  Damron testified that "[Bostic] should not have spent that much time ordering parts.  If he would have implemented [the] maintenance planning system, it would have been automatic for him.  He would not have had to waste that time ordering parts, expediting parts, and we would have seen less down time because things were not ordered."  Damron Dep. at 74-75.  Damron testified that after Bostic was terminated, there was an improvement in utilization of the maintenance planning system.  Id. at 76.

In addition, Drummond contends that Bostic was
unwilling to engage with Damron when he came to review
operations at the site.  Def. Mem. at 5.  Damron testified that

> I would generally – in the course of the week for sure, I
> would go to the highwall miner at least once.  And first
> times Mr. Bostic would, you know, accompany me to the
> miner, discuss what the issues were the best that he could.
> Later on, he would sit in his truck when I came to review
> the operation and wouldn't even get out of the truck to
> come and interact to say what was – what the issues were. .
> . . [T]he first couple of times that I noticed the pattern
> I'd wave him over and he'd come on over and we'd discuss
> the operation.  But eventually if he didn't get out of his
> truck, I didn't worry about it.  I was generally getting
> the information I needed from the operators and mechanics.

Damron Dep. at 19-20.

Damron testified that plaintiff was unable to answer
basic but important questions about the state of the day-to-day
operations.  Def. Mem. at 6; Damron Dep. at 85-86.  Drummond
also contends Bostic instructed his crew not to speak to other
Americans, including Damron.  Def. Mem. at 7.  Mullins testified
that, "The one thing that [he and Damron] discussed was that
[Bostic] didn't want us talking with other people about what was
going on at the miner. . . . We had several people that had
offered to help; sometimes we felt it was too much.  But later
on down the road, there were certain people that we were asked
just not to speak to, you know, not to talk about miner business
with."  Mullins Dep. at 49-52.

Third, Drummond says the "watershed moment" that ultimately led to Bostic's firing occurred on the night of October 14, 2014.  According to Drummond,

> On that night, one of the men working on the highwall miner failed to "put the pins onto the beams," and the operator pushed the beams "20 feet under the mountain before he realized [his mistake]."  This was a problem because, once the mining process was complete, the system would not properly retract and the miner head, which cuts the coal, would be lost inside the mountain.  [Bostic], who was off-duty at the time, was called in to help respond to the situation.  When [Bostic] arrived at the site, he and Mr. Mullins discussed how to engineer a solution to the problem.  One of the options the two men considered was "to take the augers out of one of the beams and have [Mullins] crawl through the beam and put the pins in."  However, this plan involved putting Mr. Mullins inside the mountain and under unsupported roof.

> According to Mr. Damron, when [Bostic] called him that night to report on the incident, [Bostic] told Mr. Damron that they had decided to "take the augers out of one of the beams and have [Mullins] crawl through the beam and put the pins in.  Mr. Damron immediately instructed [Bostic] not to carry out any plan to put Mr. Mullins under unsupported roof.  Mr. Damron hurried to the site and when he arrived, he concluded that the unsafe plan was still underway.

> Further, Mr. Mullins and Mr. Damron testified that the other workers were removed from the site so that there would be no witnesses.

> . . . .

> Ultimately, Mr. Damron, Mr. Mullins, and [Bostic] devised a method of reinserting the pins into the miner pushbeams without exposing anyone to unsecured roof.  However, for Mr. Damron, this incident represented "the last straw."

Def.'s Mem. at 8 (citing Damron Dep. at 36-40, Mullins Dep. at 38-40, Bostic Mem. at 123) (internal citations omitted).

## 3. Bostic Must Present Evidence of Pretext

Because Drummond has put forth non-discriminatory reasons for Bostic's firing, the burden shifts back to Bostic to present evidence of pretext. "[The Plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Knotts, 237 W. Va. at 180, 786 S.E.2d at 199 (quoting West Virginia Univ./West Virginia Bd. of Regents v. Decker, 191 W. Va. 567, 571, 447 S.E.2d 259, 263 (1994)). "[P]roof of pretext by itself can sustain a conclusion that the defendant engaged in unlawful discrimination." Syl. Pt. 5, Skaggs v. Elk Run Coal Co., 198 W. Va. 51, 479 S.E.2d 561 (1996).

To summarize, Drummond says that Bostic was fired for three reasons: (1) Bostic failed to prioritize establishing the safety procedures required for OHSAS 18001 and Damron witnessed Bostic's disregard of important safety measures; (2) Bostic had engagement and communication issues including his unwillingness to engage with the planning system and with Damron at the mine site, he instructed his crew not to speak to certain Americans, and he could not answer Damron's basic but crucial questions about the mining operations; and (3) the night of October 14,

2014, Bostic (though Mullins as well) suggested putting Mullins into the unsupported mine to put the pins in the beams manually and although Damron instructed Bostic not to move forward with the plan, it was underway when Damron arrived on site.

Bostic denies that he was fired for the reasons proffered by Drummond and states that Drummond "concocted a series of after-the-fact assertions in its discovery responses in an attempt to justify the illegal firing." Pl.'s Resp. at 18-19. Bostic consequently asserts that there is a genuine issue of material fact as to whether Drummond fired him for legitimate non-discriminatory reasons or whether the reasons were mere pretext. Id. at 18-19.

i. Mine Safety

As to the assertion that Bostic failed to prioritize mine safety, Bostic asserts that he "diligently worked to develop company safety standards for the highwall mining machine." Pl.'s Resp. at 6. Bostic testified to the following:

Q: What about safety standards? Were those set up when you got there or did you have to develop that?

A: I had to develop those.

Q: Okay. So what did you – how do you go about doing that?

A: They assigned one of the safety reps in Columbia and they were there and could speak English. I worked with him primarily. He asked lots and lots of questions about the

operation, and he came and videotaped a lot of what was involved in the operations.  And the standards were written in Spanish.  He had to write them in Spanish for the – primarily the contract company, the laborers.

. . . .

Q: Did you ever have any – did there come a time where Mr. Damron assigned a safety consultant to your group to help develop the safety standards?

A: Yes, m'am.  That's –

Q: Could you tell me about that?  What happened there?

A: I worked with him there.  Like I say, he was bilingual. He could speak English, so we worked together and we developed those standards, and he rewrote them in Spanish.

. . . .

Q: When in the process did he come in and help out with that?

A: Probably four or five months into the operation – three to four months into the operation.

Q: Do you recall that Mr. Damron ever had to have a talk with you about getting that process done or –

A: Mr. Damron never mentioned that there was a problem with that process.

Bostic Dep. at 87, 101-102; see also Mullins Dep. at 20-24.

Bostic stated he held several meetings with highwall mining and safety personnel that Damron did not attend.  Pl.'s Resp. at 6; Bostic Dep. at 101-102; Mullins Dep. at 20-23.  In addition to denying that Damron ever came to him with problems with recording the safety procedures, Damron admitted he ultimately received the safety materials he needed from Bostic.  Pl.'s Resp. at 7; Damron Dep. at 71-72.  Despite receiving the needed

materials from Bostic's crew, Bostic states that the safety

procedures for the highwall mining machine were not finalized

until two years after Scott replaced Bostic.  Pl.'s Resp. at 7;

Mullins Dep. at 27.

          In its reply, Drummond asserts that while it did

eventually receive the safety materials from Bostic's crew, it

was only after Damron delegated the task to someone else that

the necessary safety procedures were documented for OSHAS

certification.  Def.'s Reply at 5.  Drummond also argues that

while it took some time to finalize the safety procedures, it

was the initial step of documenting safety procedures that

Bostic failed to timely complete.  Id. at 5, n. 1.

          In response to Drummond's assertion that Bostic

disregarded serious safety procedures, Bostic cites to testimony

of Damron that no one in Bostic's crew was ever disciplined for

failing to lock and tag out equipment or failing to use personal

protective equipment except for being issued verbal reprimands.

Pl.'s Resp. at 7; Damron Dep. at 31-33.  He testified that the

safety procedures he used were more stringent than those

established by MSHA.  Pl.'s Resp. at 3; Bostic Dep. at 88.

Bostic points to Mullins' testimony that Bostic never did

anything he considered to be unsafe or to put anyone's safety in

jeopardy, that safety concerns were addressed and passed down to

other employees, and that he was unaware of any issues that the safety department had with Bostic or his crew. Mullins Dep. at 17, 23-24.

The court finds that there are genuine questions of material fact with respect to whether Bostic failed to embrace safety procedures, as asserted by Drummond. While Drummond contends that Bostic failed to timely establish safety procedures for the highwall mining machine, that he brought these concerns to Bostic, and ultimately had to assign the task to someone else, Bostic and Mullins testified that they were not aware of any problems Damron or any other Drummond employee had with their establishment of safety procedures for the highwall mining machine. In addition, Bostic and Mullins' testimony disputes Drummond's contention that Bostic overlooked safety procedures. A jury could reasonably conclude from Bostic and Mullins' testimony that Bostic developed the safety procedures as instructed and that he did not disregard safety procedures.

ii. Engagement and Communication

Bostic denies that he had issues in engaging with and communicating with other Drummond employees. While Drummond contends that Bostic failed to engage with the planning system, which caused him to spend too much time ordering parts, Bostic stated that the bilingual planner who was supposed to assist him

in ordering parts "did not have the proper experience or expertise to then assist Bostic." Pl.'s Resp. at 6. According to Bostic's testimony,

> Late in the operation when I was there, they gave me a shovel planner who was supposed to order parts, but he was a young Columbian national that had never been around a highwall miner, so he was having to be trained to order the parts. I mean he didn't know want [sic] to order.
>
> We did later on start – if you could give him part numbers then, yeah, he could just call on the phone and order them. But he didn't know what to order because you had to go through the book and decide what had to be ordered.

Bostic Dep. at 26-29; <u>see</u> <u>also</u> Mullins Dep. at 46 ("[T]he person to order parts back in 2013, all he would have to go off of would be a recommended list by Caterpillar."). Bostic additionally testified that Damron never informed Bostic that he was spending too much time tracking or ordering parts and that Damron never talked about the necessity of Bostic getting more engaged in the day-to-day operations of the highwall mining machine or management process. Pl.'s Resp. at 6; Bostic Dep. at 104, 106.

Mullins testified to knowing of no performance issues regarding Bostic, and that while they disagreed about how many parts to order, he didn't "see anything that [he] thought that [Bostic] was doing out of the way." Mullins Dep. at 30.

23

Drummond cites to Mullins' testimony that he disagreed with Bostic about the number of parts that were ordered as evidence that Bostic was not doing his job satisfactorily. Def.'s Reply at 4. However, according to Damron's testimony and Drummond's motion for summary judgment, Bostic was fired, in part, because he was spending too much time ordering parts, not because he failed to order the proper number of parts. Def.'s Mem. at 3-4.

While Drummond, using Mullins' testimony, contends that Bostic instructed his crew not to speak to certain Americans, including Damron, Bostic testified that he never told his crew not to talk directly to Damron, but that he did not like it when they spoke to a certain supervisor who kept them from doing their work. Bostic stated,

> A: I told them that if [Damron] ever asked a question to be honest with him and tell him what he – what he wanted to know. Now, I did – I'll add this, I did have a supervisor from a – they had machines up there to load the trucks from the drag lines. The only operation I ever saw that they loaded trucks from the dragline, but they had crushers that load the trucks. . . . And there was a supervisor from that department, he would go down on the machine and talk to my ex-pats and keep them from doing their work. And I did have a problem with that one time. I told Mr. Damron I had a problem with it, and I told his supervisor, David Bull, that he needed to keep him off the machine, he was holding up work down there.
>
> . . .
>
> Q: And what was his job title?

A: Assistant superintendent.

Q: Okay.  Did Mr. Damron have any problem with that?

A: He said he would talk with him, but it continued to go on for a while, so I don't know whether he ever did talk with him.  He would —primarily, Mr. Damron would leave on the weekends and go home.  That's primarily when it would happen, when he wasn't there or David Bull wasn't there, his supervisor.

Drummond Dep. at 105-06.

The court finds that Bostic has sufficiently raised a genuine question of material fact as to whether he was fired in part due to his inability to engage with and communicate with other Drummond employees or whether this was mere pretext for his firing.  While Damron testified that Bostic refused to utilize the system for ordering parts, Bostic testified that he had difficulties training the helper because the helper did not have experience in longwall mining and had to learn about the system.  Bostic also testified that he never received any complaints about his performance and Mullins additionally testified that he did not have any problems with Bostic beyond disagreements regarding the number of backup parts they should keep on hand and that he was not aware of any complaints about Bostic's performance.  Finally, Bostic testified that he never told his crew to stay away from Damron, and additionally explained that he did ask them not to speak with a supervisor who kept his crew from doing their job.  A reasonable jury could

find from Bostic and Mullins' testimony that Bostic did not suffer from the communication and engagement failures that Drummond asserts led to his termination.

iii. October 14, 2014 Incident

Bostic disputes Drummonds' characterization of the events of October 14, 2014.  According to Bostic's testimony, that night, he was off-site when he was called by Mullins and advised that the operator, Steve Caldwell, failed to put the pins into the beams before they were pushed twenty feet under the mountain.  Bostic Dep. at 124.  Bostic then came to the site and Caldwell, Mullins, and Bostic discussed various options to get the pins back into the beams.  Id.; Mullins Dep. at 36. Mullins testified that they discussed "several different ideas." Mullins Dep. at 36.  Ultimately Mullins "brought up the idea . . . of putting one of the push beams up there and take an auger out of it where he can go back through that space where the auger is at."  Bostic Dep. at 124; Mullins Dep. at 36-37.

Bostic called Damron, who was off-site, to advise him of the situation and to discuss various options for remedying the situation.  Mullins Dep. at 38; Bostic Dep. at 125.  During their conversation, Bostic brought up Mullins' idea to have

Mullins crawl into the beam and put the pins in.[1]  Pl.'s Resp. at
8; Mullins Dep. at 38; Bostic Dep. at 125.  "Mr. Damron said he
didn't want to do that.  He wanted to try something else."
Bostic Dep. at 125.  After Damron vetoed that idea, Bostic and
Mullins testified that they did not continue that plan.  Mullins
Dep. at 38; Bostic Dep. at 125.  Mullins testified, "[Bostic]
called Mr. Damron and made some suggestions to him, offered some
opinions.  As far as putting the beams in the hole, taking the
augers out of the bottom, it was an absolute no.  So that was
the end of it.  We had to have another idea."  Mullins Dep. at
38.

        According to Bostic, no one physically carried out the
plan or otherwise continued it after Damron rejected it during
their phone conversation.  Bostic Dep. at 125; Mullins Dep. at
38; Damron Dep. at 40 (stating that no one went "into the
hole.").  When Damron arrived on site, Bostic, Mullins and
Damron came up with a plan where the machine shop made a "handle
on . . . a 20-foot rod, a round thing to hold the pin where we

---

[1] In his response to the motion for summary judgment, Bostic
contends, citing to his deposition, that he told Damron it was
Mullins' idea to place the pin in himself.  Pl.'s Resp. at 8
(citing Bostic Dep. at 130-131); see also Bostic Dep. at 125 ("I
brought that option up that Sherman had brought up about
stacking the beams.").  The court finds that a reasonable jury
could infer from Bostic's testimony that he told Damron that it
was Mullins' idea.

could reach out there and try to drop it in." Pl.'s Resp. at 8; Bostic Dep. at 125. After one to two hours, Mullins was able to drop a pin in and Bostic "made the decision to pull [the beams] with one pin and it came out fine with one pin holding it." Bostic Dep. at 126-129. This resolved the issue. Id.

Bostic testified that he did not send the rest of the crew away so that there would be no witnesses, as Drummond asserts, but because it took a while to make the rod in the machine shop, and "[i]t did not make sense to have ten employees standing around under the highwall, and consequently, those other employees were sent to do other things, including going to the arc, a place where spare parts were kept." Bostic Dep. at 125, 127. Mullins similarly testified that he and Bostic "sent the guys out to the arc to work so we could discuss and figure out what to do." Mullins Dep. at 40.

The court finds that there are genuine questions of material fact relating to the events of October 14, 2014. Damron testified that Bostic not only suggested a plan that required Mullins to be placed inside the mountain that was unsupported, but also that despite telling him on the phone not to carry out the plan, it was nevertheless underway when he arrived on site. According to Drummond, this was the last straw and led to Bostic's firing. However, both Bostic and Mullins

testified that this plan was one of multiple options suggested, and that once Damron rejected the idea, they abandoned it so that it was not underway when Damron arrived.

## IV.  Conclusion

Bostic has, at the least, raised serious questions of material fact with respect to whether the reasons given for his termination were legitimate or pretextual.  The court finds that there are genuine questions of material fact regarding the proffered reasons for Bostic's termination.  A reasonable jury could, upon review of the evidence, reject Drummond's listed reasons for terminating Bostic and instead find that he was fired due to his age based upon "proof of pretext," see Syl. Pt. 5, Skaggs, 198 W. Va. 51, 479 S.E.2d 561, and the evidence put forward by Bostic, includipng that he was replaced by someone 15 years younger than he was and that he was treated differently than Mullins for the events on October 14, 2014.  Bostic has "submitted credible evidence of the McDonnell Douglas/Barefoot prima facie case and enough evidence of pretext to create a question of fact [so that] the case should go to the jury."  See Syl. Pt. 5, Skaggs, 198 W. Va. 51, 479 S.E.2d 561.

It is accordingly ORDERED that the motion for summary judgment filed by defendant Drummond Ltd. be, and it hereby is, denied.

The Clerk is requested to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: July 13, 2017

John T. Copenhaver, Jr.
United States District Judge